UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

JOSEPH ASH, JUSTIN BOLTON,                    CIVIL ACTION NO.
and MATTHEW CRAWFORD
                                              JUDGE
VERSUS
                                              MAGISTRATE JUDGE
FLOWERS FOODS, INC. and FLOWERS
BAKING COMPANY OF BATON ROUGE, LLC

_____

## COMPLAINT AND JURY DEMAND

Each of these three (3) Plaintiffs, by and through undersigned counsel, file this Complaint, respectfully alleging as follows:

1.

This Complaint seeks declaratory, injunctive, and monetary relief from Defendants' misclassification of their Louisiana deliverymen as "independent contractors."  Defendants Flowers Foods, Inc. and Flowers Baking Company of Baton Rouge, LLC ("Flowers Baton Rouge") and their subsidiaries and affiliates (collectively "Flowers" or "Defendants") are in the wholesale bakery business and rely on deliverymen to stock bakery goods in grocery stores, mass retailers, and fast-food chains.  Plaintiffs Joseph Ash, Justin Bolton, and Matthew Crawford are each former deliverymen with Flowers in Louisiana.  Plaintiffs allege violations of  the Federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and the Louisiana Wage Payment Law, and seek Declaratory Judgment pursuant to 28 U.S.C. § 2201.

2.

This action challenges both the classification of Plaintiffs as independent contractors and Defendants' denial to Plaintiffs of the rights, obligations, privileges, and benefits owed to them as employees under federal and state law, including overtime compensation, and reimbursement of illegal deductions.

3.

All Plaintiffs were part of an Opt-In Collective Action against FlowersFoods in the case of *Richard, et al v. Flowers Foods, Inc., et al.,* No. 6:15-cv-02557 of the United States District Court for the Western District of Louisiana, Lafayette Division which was filed on October 21, 2015 (the "Richard Action").  On April 9, 2021, the Court  in *Richard* decertified  the Collective  Action.  However, because the decertification of the FLSA Collective Action impacts the statute of limitations on the Plaintiffs' FLSA claims, Plaintiffs bring this new action to protect their rights under the statute of limitations.

## **PARTIES**

4.

Plaintiff Joseph Ash is a resident of Hessmer, Louisiana who opted in to the Richard Action on January 16, 2017. Plaintiff Ash worked as a deliveryman for Flowers in Louisiana from January 2002 until March 2016. He delivered to local retailers bakery and snack food products manufactured or sold by Flowers. Plaintiff Ash operated out of a distribution center run by Flowers Baton Rouge in Alexandria, Louisiana. Plaintiff Hebert regularly worked 77 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Ash used his small personal vehicle to deliver for Defendants every week, occasionally, on Wednesdays and Sundays, and sometimes twice a day.

5.

Plaintiff Justin Bolton is a resident of Deville, Louisiana who opted in to the Richard Action on January 16, 2017. Plaintiff Bolton worked as a deliveryman for Flowers in Louisiana from 2013 until November 2014. He delivered to local retailers bakery and snack food products manufactured or sold by Flowers. Plaintiff Bolton operated out of a distribution center run by Flowers Baton Rouge in Alexandria, Louisiana. Plaintiff Bolton regularly worked 90 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Bolton used his small personal vehicle to deliver for Defendants every week, occasionally, on Saturdays and Sundays.

6.

Plaintiff Matthew Crawford is a resident of Winnfield, Louisiana who opted in to the Richard Action on January 7, 2016. Plaintiff Crawford worked as a deliveryman for Flowers in Louisiana from 2009 to September 2014. He delivered to local retailers bakery and snack food products manufactured or sold by Flowers. Plaintiff Crawford operated out of a distribution center run by Flowers Baton Rouge in Natchitoches, Louisiana. Plaintiff Crawford regularly worked 100.5 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Crawford used his small personal vehicle to delivery for Defendants every week, at least twice a week on Wednesdays and Sundays.

**DEFENDANTS**

7.

Defendant Flowers Foods, Inc. is a Georgia corporation with its principal place of business at 1919 Flowers Circle, Thomasville, Georgia, 31757.  Flowers hires individuals whom it classifies as independent contractors, to distribute its products by delivering them to

grocery stores and stocking the products on store shelves. Flowers employs deliverymen in at least 31 states throughout the southern and eastern parts of the United States, including Louisiana. Flowers is and at all relevant times was an employer of Plaintiffs under the FLSA and Louisiana law.

8.

Defendant Flowers Baking Company of Baton Rouge, LLC is a Louisiana Limited Liability Company with its principal place of business at 501 Louisiana Avenue, Baton Rouge, Louisiana, 70802.  Flowers Baton Rouge operates three (3) bakeries that serve Louisiana:  one in Evangeline, Louisiana, one in Lafayette, Louisiana, and one in Baton Rouge, Louisiana. Flowers Baton Rouge is a wholly owned subsidiary of Flowers Foods.  Flowers Baton Rouge uses deliverymen, whom it classifies as independent contractors, to deliver and stock Flowers Foods bakery and snack products from its Louisiana distribution centers in DeRidder, Lake Charles, and Sulphur to retailers throughout southwest Louisiana.  Flowers Baton Rouge is and at all relevant times was an employer under the FLSA and Louisiana law.

**JURISDICTION AND VENUE**

9.

This Court has jurisdiction over the federal law claims asserted in this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction.

10.

Venue is proper in this Court under 28 U.S.C. § 139l(b)(2) because a substantial part of the events giving rise to the claim occurred in this district, and 139l(c) because the defendants are subject to personal jurisdiction here.

11.

This Court has supplemental jurisdiction over the state law claims under the LWPA pursuant to 28 U.S.C. 1367.

## FACTUAL BASIS

### A.  Flowers Acquired Local Bakeries and Converted Their Employees to Independent Contractors

12.

Defendant Flowers has built an integrated network of subsidiaries, such as defendant, Flowers Baton Rouge to manufacture and market bakery products for national sale and distribution.

13.

Flowers' subsidiaries, such as Flowers Baton Rouge, bake the products and carry out Flowers' distribution at the local level.

14.

Deliverymen are an integral part of Flowers' business and distribute more than 85 percent of Flowers' total products.

15.

Flowers defines a deliverymen's core responsibilities as ordering products, stocking shelves, maintaining special displays, maintaining good customer relations, ensure adequate inventory, and removing unsold goods before expiration.

16.

Prior to Flowers' acquisition of Huval Bakery, Incorporated ("Huval") and Holsum Bakery, Inc. ("Holsum") on December 28, 2000, Huval and Holsum were independent bakeries that delivered bread to customers using employees called Route Salesmen ("RS").

17.

RSs were classified as employees of Huval and Holsum, received benefits, paid vacation, disability insurance, and workers comp, and were paid a weekly salary plus commissions.

18.

When Flowers purchased Huval and Holsum, it ostensibly converted their RS employees to independent contractors in accordance with Flowers' Distributor Model.

19.

Flowers provided a detailed plan for this conversion, including specific instructions as to how territories should be determined, drawn, and described.

20.

The RSs were notified that to keep their jobs they were required to purchase their routes from the bakery and become independent contractors.

21.

The decision to convert the RSs from employees to independent contractors was made on a universal basis based on the Flowers' model; none of the Defendants made individual determinations with respect to whether any RS should remain an employee or become an independent contractor.  In fact, some of the RSs questioned why they were being asked to purchase their routes and were told it would be as an investment.

**B.**     **The Flowers Model Centralizes Control Over the Marketing and Sale of Products.**

22.

Flowers' customers are primarily large retail and grocery chains, such as Wal-Mart, Target, and Dollar General; and restaurants, such as Burger King, Dairy Queen, and Canes.  Flowers' top ten customers account for nearly half of all sales. Flowers' largest customer-Walmart/Sam's Club-represent 20 percent of the Company's sales.

23.

Flowers established a National Accounts Team responsible for developing and maintaining relationships with national account retailers.

24.

Flowers' National Accounts Team is "the face of the company," representing Flowers with each retailer or restaurant because the customer cannot logistically work individually with each Flowers bakery.

25.

Flowers' National Accounts Team initiates meetings with potential and existing customers, leads proposal meetings, bring samples of the products to customers, and offers suggested retail and wholesale pricing.

26.

Flowers' National Accounts Team handles all business discussions with accounts, including negotiating:

a.     Wholesale and retail prices for products;

b.     Service and delivery agreements;

c.      Shelf space to display products;

d.      Product selection;

e.      Promotional pricing for products;

f.      The right to display promotional materials;

g.      Print advertisements in retailers' newspaper ads; and

h.      Virtually every other term of the arrangement.

27.

Once a customer accepts Flowers' program, the National Accounts Team notifies the local subsidiary of the program's feature, timing, price point, and display, only then does the subsidiary communicate it to the deliverymen.

28.

Neither local subsidiary management nor the deliverymen have the authority to change these programs that are negotiated by the Flowers' National Accounts Team.

29.

Once a customer accepts Flowers' program, implementing it becomes a mandatory part of deliverymen's jobs.

30.

Flowers also employs a Business Analysis and Insights Team to help create sales presentations to pitch new products to national account retailers.

31.

Flowers handles all marketing efforts utilizing sophisticated consumer research companies to forecast consumer trends for retailers to make informed decisions on product selection and to support the retailer's brands with advertising and marketing plans and promotions.

32.

Category and brand strategies are set by separate business units organized into a Category and Brand Teams, a Field Marketing Team, and a Product Innovation Team. The business units are responsible for increasing sales of Flowers products, which sales ultimately affect deliverymen's livelihoods.

33.

Field Marketing teams monitor deliverymen's work inside the stores.

34.

Each Field Marketing team comprises regional managers and field marketers who both direct sales efforts in retail stores serviced  by deliverymen and ensure that deliverymen  carry out marketing programs agreed upon by the National Accounts Team or local sales management.  The Field Marketing team uses mobile software, "GoSpotCheck," to ensure, among other things, that the right products are on store shelves at the right price.

35.

At the local level, Flowers relies on its employee managers to ensure Flowers' products are distributed in accordance with Flowers' national sales strategy.

36.

Like the corporate sales teams, Flowers Baton Rouge sales employees  are organized into a hierarchy of Regional Vice President of Sales, VP of Region, Market VP, and several Area Sales Directors.

37.

Until January 1, 2018, Flowers Baton Rouge also employed a team of Sales Managers; these individuals were promoted to Area Sales Directors or transitioned into Territory Operations Specialists as part of a reorganization effort.

38.

Deliverymen interact with their warehouse Sales Managers (now Area Sales Directors) on a daily basis.  To ensure all Area Sales Directors perform consistently, the Vice President of Sales tightly controls each Sales Director through daily and weekly communication.

39.

The Area Sales Directors primary job duties involve supervising deliverymen in their day-to-day activities in the following ways:

a.    Being on the dock every morning when deliverymen arrive;

b.    Conducting at least 15 "market checks" each week, where the Area Sales Directors go into stores with a checklist to ensure that deliverymen have placed products in accordance with the planogram (a diagram showing exactly where each product should goon the shelf), removed stale or out of code product, and are using end caps, promotional displays, and any other available shelf space;

c.    Conducting "ride alongs" with deliverymen to ensure they are following all of Flowers' requirements;

d.    Visiting "trouble stores;"

e.    Ensuring deliverymen make their afternoon callbacks;

f.    Running various reports on stales, days of service, and other metrics;

g.    Verifying deliverymen's stale numbers; and

h.      Checking bread orders for routes with high stale numbers.

40.

In addition to ensuring deliverymen are properly performing their jobs, all Vice Presidents of Sales (for all Flowers subsidiaries) are required to assign local sales managers sales goals. Those local sales managers build and maintain relationships with store managers, as well as reviewing deliverymen's work in those stores, looking for opportunities to make additional sales.

**C.      Defendants Hire and Train deliverymen to Make Deliveries and Stock Products**

41.

Deliverymen serve as the final link in the chain between Flowers, the subsidiaries,and the customers.

42.

The work performed by Plaintiffs simultaneously benefits or benefited Flowers Foods, Inc., and Flowers Baton Rouge.  Plaintiffs were hired for the purpose of delivering products for Flowers Foods, Inc.

43.

Deliverymen are sometimes hired through a staffing agency using a standardized application.  They begin work with Flowers Baton Rouge as temporary or prospective deliverymen.  While running routes as temporary, or prospective employees, the deliverymen are paid overtime.

44.

The job performed by Plaintiffs does not require specialized skills or education, only training by Flowers.

45.

Deliverymen are not required to have owned a business or have any delivery, sales, or marketing experience. Flowers Baton Rouge only requires them to have a (non-commercial) drivers' license and a clear background and drug test.

46.

Deliverymen hired by Flowers Baton Rouge are required to complete a standardized, twelve-week training program detailed in the Field Operations Manual, which is focused almost exclusively on deliverymen's duties.

47.

Upon successful completion of the training program, Flowers Baton Rouge decides whether a prospect becomes a deliveryman.

48.

When a prospect signs an agreement, Flowers Baton Rouge automatically classifies him as an independent contractor.

49.

Flowers Baton Rouge makes no individual determinations of employment classification for deliverymen.

**D.      Deliverymen's Duties are to Deliver and Maintain Product.**

50.

On delivery days, which are usually Monday, Tuesday, Thursday, Friday, and Saturday, deliverymen arrive at the warehouse early in the morning to confirm their product orders, make any necessary adjustments, load their trucks, and make deliveries.   On Wednesdays and Sundays, which are usually "pull up" days, deliverymen use their personal vehicles at various times to "pull up" product from storage and to make an additional pickup or delivery of product.

51.

Deliverymen then drive their route to deliver products to customers.

52.

Deliverymen's investment in equipment to operate their route is relatively low, and like the purchase price of their route, is often financed by Flowers.

53.

Deliverymen use their personal vehicles and a small box truck or trailer to deliver Flowers' products to retailers. Apart from the box truck or trailer purchase, there is no other investment necessary because Defendants provide computer equipment, administrative support, warehouse space, advertisements, promotional materials, bakery trays, marketing, strategic development, and virtually every other business necessity, albeit at a cost deducted from the deliverymen's weekly statements, which is illegal under the LWPA.[1]

54

All of deliverymen's routes are wholly within the State of Louisiana.

---

[1] See Paragraphs 162 through 164, *infra*.

55.

Most of deliverymen's customers have "Customer Service Requirements," which contain requirements such as days of service, mandatory receiving hours, limits on attire, and other such requirements.

56.

Flowers represents that these requirements come from the customer, but Flowers often has a hand in drafting the requirements or soliciting accounts to provide such requirements to deliverymen.

57.

Once at a store, deliverymen's duties include:

a.      Placing product on the shelves, usually according to a planogram, which shows exactly where and how much of each product should be placed on the shelf. Such planograms, as well as shelf space, are agreed to by the National Accounts team and the customer, and cannot be changed by the Distributor;

b.      Rotating product to ensure the oldest product is in the front;

c.      Pulling out-of-code or "stale" product off the shelves; and

d.      Setting up displays for featured or "promotional" products. These "promotional planners" are created by the National Accounts Team and the customers and dictate which products will be on promotion every week. These planners include the specific product and price of the product and involve a planogram or stand-alone display. Deliverymen are required to adhere to these planners, including ordering sufficient product to fill the shelf or display.

58.

Many large accounts require a second visit every day in the afternoon, commonly known as a "recall" to straighten and restock shelves for afternoon business.

59.

Deliverymen are required to service any new chain or national account that opens in their area or requests service from Flowers/Flowers Baton Rouge.

60.

Most accounts are "credit accounts," which remit payment directly to Flowers Baton Rouge; deliverymen do not collect payment from these accounts.  Such accounts usually make up approximately 80% or more of the deliverymen's accounts.

61.

A few customers are cash accounts, which pay deliverymen directly. Such accounts usually make up 20% or less of Flowers Baton Rouge's net sales.

62.

Deliverymen place their orders for product by connecting  Flowers' handheld computer to a warehouse terminal to transmit orders to the bakery.

63.

All deliverymen are required to use handheld computers, issued by Flowers, to place orders for products.  Flowers allegedly deducts a weekly charge for the use of the handheld computers and other administrative services.

64.

Orders must be placed six days in advance.

65.

The handheld gives deliverymen "suggested orders" for each account, which they are strongly encouraged to follow.

66.

Flowers Baton Rouge may also place orders for deliverymen or require deliverymen to take featured products.

67.

On non-delivery days, which are usually Wednesdays and Sundays, each Plaintiff uses his personal small vehicle to perform "pull-ups" for Defendants; during which deliverymen drive to their assigned stores to restock store shelves and pull out-of-code or stale product from the market.  Many of the deliverymen deliver additional product at the same time as they do "pull-ups."

68.

Deliverymen are paid via weekly "settlement statements" by Flowers Baton Rouge, typically through direct deposit to deliverymen's bank accounts.

69.

Deliverymen are essentially paid on commission; deliverymen "purchase" product from Defendants at a percentage discount from the wholesale price.

70.

Depending on the product, deliverymen will receive an approximate 3 to 23 percent discount or margin on a product, with most products offered at an 18 to 20 percent discount.

71.

These margins are set by Flowers, are non-negotiable, and are the same across regions.

72.

Flowers exerts nearly complete control over the prices at which products are sold to customers.

73.

For national accounts, deliverymen are forbidden from changing the price of a product. Deliverymen sign a "Distributor Checklist" stating that they cannot change the prices for fast food/restaurant business or in national accounts.

74.

Deliverymen may also receive temporary additional discounts, which are set by Flowers Baton Rouge and can be discontinued or reduced by Flowers Baton Rouge at will.

75.

Section XII of the Distributor Agreement requires all deliverymen to remove products past their sell-by date from the retail market.

76.

Products past their sell-by date are known as "out-of-code" or "stale" product.

77.

The act of removing the product from retail outlets is colloquially known as "pulling stale."

78.

Deliverymen are expected pull stale whenever product is out of code.

79.

Products may become out of code  on a day that is not a retailer's  usual service day; in that case, the Distributor may make a special trip to pull stale. Alternatively, the Distributor may pull the stale product earlier to avoid having to make a special trip.

80.

According to the Distributor Agreement, "Maintaining a fresh market is a fundamental tenet of the baking industry."

81.

Accordingly, "Out of Code Products or Authorized Products left in the market is a material breach of this Agreement."

82.

Flowers regards stale product as a necessary part of operating a direct store delivery program because of the very short time the product stays in a retail outlet.

83.

In recognition of the necessity of stale in the business model, Flowers "repurchases" a certain percentage of each deliverymen's stale products

84.

Flowers  created this secondary  market for product  that has been in an outlet for more than a few days but is still salable.

85.

At the end of the day, deliverymen generally return to the warehouse to "sell back" their expired sell date products, out of code, or stale product to the warehouse thrift store for credit.

86.

Thrift stores are not the only participants in the secondary market for stale product. Flowers supplies stale product to institutions, farmers, and discount retailers, such as Big Lots and Dollar Tree.

87.

A deliveryman with consistently high stale returns, may be monitored more closely by management or put on a "stale cap" which limits the amount of product Flowers Baton Rouge will repurchase from them or deducts the cost of the product from deliverymen's weekly revenue.

**E.     Defendants Monitor and Discipline Deliverymen for Failure of Performance.**

88.

Deliverymen's relationship with Flowers is governed by the DistributorAgreement, which all deliverymen are required to sign, and which is materially uniform or substantially similar among all Flowers Baton Rouge deliverymen.

89.

The Distributor Agreement requires deliverymen to use their "best efforts" inaccordance with "good industry practice."

90.

Under obligations of the Distributor, the Agreement states:

Distributor agrees and covenants to use Distributor's commercially reasonable best efforts to develop and maximize the sale of Products to Outlets within the Territory and service the Territory in accordance with Good Industry Practice.

91.

Good Industry Practice is defined as:

The standards that have developed and are generally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products and Authorized Products in all Outlets requesting service, actively soliciting all Outlets not being serviced, properly rotating all Products and Authorized Products, promptly removing all stale Products and Authorized Products, maintaining proper service and delivery to all Outlets requesting service in accordance with Outlet's requirements.

92.

Flowers thus retains the exclusive right to control the manner and means by which deliverymen perform their jobs.

93.

The Distributor agreement also lays out discipline and termination procedures.

94.

The Distributor Agreement grants Flowers the right to terminate deliverymen on twenty-four hours' notice for a "non-curable breach" or on ten days' notice for an uncured "curable breach."

95.

Flowers defines a non-curable breach to include "any action or inaction on Distributor's part that results in Distributor's inability to service any Chain account." Ex. 11 at § 17.2.

96.

Flowers defends curable breach is defined to broadly include the "failure of performance by Distributor."

97.

Deliverymen may be breached for: failing to service stores five days per week, having out-of-code products on the shelf, having insufficient quantities of products on the shelf (being out-of-stock), failing to adhere to planograms, or failing to cooperate with the Company on its marketing and sales efforts by, for example, failing to order sufficient product to fill a special display.

98.

Plaintiffs were/are required to accept Flowers' conditions of employment or face termination.

**F.      Deliverymen are Not Engaged in Sales.**

99.

Flowers represents to Plaintiffs that they will run their businesses independently, have the discretion to use their business judgment, and have the ability to manage their businesses to increase profitability.

100.

Contrary to Flowers' representations, as outlined above, deliverymen's responsibilities are limited to delivering and stocking Flowers' products for Flowers' customers.

101.

The Distributor Agreement does not require deliverymen to grow, increase, or make "sales."

102.

Deliverymen do not have sales goals or targets.

103.

Flowers does nothing to ensure deliverymen are regularly engaged in sales-related activities.

104.

Flowers does not track the amount of time deliverymen spend trying to increase or make sales.

105.

Flowers does not keep records of when deliverymen obtain new business.

106.

Flowers does not keep records of the growth rate of deliverymen's territories.

107.

Flowers does not keep records of sales directly attributable to the efforts of deliverymen.

108.

Flowers has no way of knowing whether a Distributor is working to promote new products.

109.

Deliverymen are not disciplined for failing to engage in sales-related activity.

110.

Flowers' strategy to grow sales is not dependent upon the sales efforts of deliverymen. Rather, as described in Section B, *supra,* Flowers employs a vast marketing and sales team to manage relationships with customers, develop and promote new products, and negotiate pricing, shelf space, and promotions.

**G.      Deliverymen Do Not Operate or Deliver Interstate.**

111.

The Distributor Agreement signed by all deliverymen is a contract with Flowers Baton Rouge.

112.

Flowers Baton Rouge is not a motor carrier within the meaning of the FLSA.

113.

In recent filings, Flowers argued to the Eleventh Circuit Court of Appeals that Flowers and its subsidiaries are "not part of the transportation industry" because Flowers is a "baking company, not a shipping or logistics company." *See Martins v. Flowers Foods, Inc. et al.,* No. 20-11378, Reply Brief for Defendants-Appellants, at 3-4 (11th Cir. Aug. 24, 2020).

114.

Flowers further argued that deliverymen "are not actually engaged in the transportation of goods in interstate commerce ..." and that "Plaintiffs are, first and foremost, independent business owners, not truck drivers. And any transportation Plaintiffs do undertake is exclusively local, not interstate." *Id.* at 7.

115.

Flowers bases this argument on the fact that Plaintiffs do not transport good across state lines - rather, they own "geographically bounded businesses that operate exclusively within a single state." Moreover,  in response to the argument that the "interstate"  requirement  is satisfied by the fact that Plaintiffs transport goods that may, at some point in their history, have crossed state lines; Flowers argues "that argument has no basis in statutory text, legislative purpose, or historical context." *Id.* at 9.

116.

Likewise, here, Plaintiffs' routes are limited to the State of Louisiana.

117.

Although some of the products Plaintiffs deliver come from out-of-state bakeries, this is not sufficient to demonstrate that Plaintiffs operate in interstate commerce.

118.

Plaintiffs place orders through their handheld computers.  These orders go directly to Flowers Baton Rouge.

119.

The handheld interfaces with a centralized system called SAP, which captures the orders from each Distributor, consolidates them, and sends them to the bakery for production.

120.

Orders are thus aggregated from deliverymen from different warehouses and even different subsidiaries.

121.

Once produced, the various bakeries, both in-state and out-of-state, ship their products using a third-party shipper to Flowers Baton Rouge Bakeries.

122.

Once the products arrive at Flowers Baton Rouge Bakeries, Flowers employees sort it by warehouse and ship it out.  The product may be stored for up to two days before being shipped out.

123.

At the warehouse, Flowers Baton Rouge employees break down the product loads by deliverymen.

124.

Thus, bakeries do not know to whom its products will ultimately be shipped, and deliverymen do not know from which bakery its products arrived.

125.

Plaintiffs therefore do not operate in interstate commerce within the meaning outlined by the Motor Carrier Act.

126.

Even if Plaintiffs are considered to operate in interstate commerce, each Plaintiff uses his personal vehicle, weighing less than 10,000 pounds, to perform at least "some meaningful work" for Defendants.

127.

Specifically, each Plaintiff drives his small personal vehicle at least twice a week on Wednesdays and Sundays to perform pull-ups, during which they restock store shelves and pull out- of-code product from the market, and occasionally for "call outs" or "hot shots" to supply stores whose supply of products is temporarily exhausted.

128.

Pull-ups are required by Flowers, which can discipline deliverymen for failing to perform pull-ups.

129.

Therefore, even if Plaintiffs operate in interstate commerce, they are still entitled to overtime under the Technical Corrections Act.

**H.      Defendants' violations of the FLSA were Willful and Defendants Lacked Good Faith and a Reasonable Basis to Classify Plaintiffs as Independent Contractors.**

130.

Flowers uniformly labels deliverymen as independent contractors.

131.

Flowers does not consider any individual deliverymen's circumstances in determining whether the individual is an employee or independent contractor under the FLSA.

132.

Flowers does not receive a legal determination as to the classification of any particular Distributor.

133.

At the time Flowers classified many of their Louisiana deliverymen as independent contractors, it was involved in litigation challenging the classification of deliverymen in the state of North Carolina.  *See Rehberg v. Flowers Foods,* No. 3:12-cv-00596 (W.D.N.C.).

134.

Upon information and belief, Flowers did not receive a legal opinion or advice as to the propriety of re-classifying its Route Sales Associates as independent contractors.

135.

Upon information and belief, Flowers has been on notice since at least 1985 or 1986 that its classification of deliverymen as independent contractors is legally suspect.

136.

Flowers has been sued for FLSA violations at least 17 times since 2012.

137.

Upon information and belief, Flowers knew that Plaintiffs performed work that required overtime pay and knowingly and willfully failed to pay Plaintiffs their overtime wages due and owing.

138.

Flowers has operated under a scheme to deprive Plaintiffs of overtime compensation by failing to properly compensate them for all time worked.

139.

Flowers' conduct, as set forth in this Complaint, is willful, lacks good faith, and has caused significant damages to Plaintiffs.

140.

Flowers is liable under the FLSA for failing to properly compensate Plaintiffs for their overtime work.

**JOINDER IS PROPER UNDER RULE 20**

141.

Under Federal Rule of Civil Procedure 20(a)(l), Plaintiffs may join in one action if: (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising

out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action.

142.

Here, as detailed above, all Plaintiffs operated as deliverymen for Defendants in Louisiana pursuant to a Distributor Agreement which was substantially similar between Plaintiffs, all Plaintiffs performed essentially the same duties as deliverymen, and all Plaintiffs worked in excess of 40 hours per week without overtime compensation. Thus, Plaintiffs' request for compensation for overtime arises out of the same series of transactions or occurrences.

143.

In addition, the following questions of fact and law are common to all Plaintiffs:

a.    Whether Plaintiffs have been misclassified as independent contractors;

b.    Whether Plaintiffs were denied overtime under the FLSA;

c.    Whether Plaintiffs are entitled to declaratory relief declaring they are employees of Defendants;

d.    Whether Plaintiffs are entitled to injunctive relief requiring Defendants to convey to Plaintiffs the rights, privileges, and benefits of employees.


**<u>COUNT I</u>**
**VIOLATION OF THE FAIR LABOR STANDARDS ACTS OF 1938**
**29 U.S.C. §§ 201 ET SEQ.**
**Overtime Violations**

144.

Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs.

145.

Section 202(a) of the FLSA provides:

The Congress finds that the existence, *in industries engaged in commerce or in the production of goods for commerce*,[2] of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. That Congress further finds that the employment of persons in domestic service in households affects commerce. (Emphasis added)

146.

Flowers is engaged in commerce or in the production of goods for commerce within the meaning of § 202 of the FLSA.

147.

Section 207(a)(l) of the FLSA provides in pertinent part:

Except as otherwise provided in this section, *no employer shall employ any of his employees who* in any workweek is engaged in commerce or in the production of goods for commerce, or *is employed in an enterprise engaged in commerce or in the production of goods for commerce*, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.  (Emphasis added)

148.

Plaintiffs are "employed in an enterprise engaged in commerce or the production of goods for commerce" within the meaning of § 207(a)(1) of the FLSA.

149.

Plaintiffs do not driver or operate in interstate commerce, and therefore the Motor Carrier Act exemption does not apply to Plaintiffs.

---

[2] § 203(b) defines commerce as interstate commerce.

150.

Even if Plaintiffs are found to operate in interstate commerce, Plaintiffs routinely drove or drive their personal vehicles for work, and therefore the Motor Carrier Act exemption does not apply.

151.

Plaintiffs are not regularly engaged in sales, and therefore the Outside Sales Exemption does not apply.

152.

Each Plaintiff regularly worked more than 40 hours per week but did not receive overtime pay.

153.

At all relevant times, Flowers has had gross operating revenues in excess of $500,000.

154.

In committing the wrongful acts alleged to be in violation of the FLSA, Flowers acted willfully in that they knowingly, deliberately, and intentionally failed to pay overtime premium wages to Plaintiffs.

155.

As a result of Flowers' failure to pay overtime premium wages, Plaintiffs were damaged in an amount to be proved at trial.

156.

Therefore, each Plaintiff demands that he be paid overtime compensation as required by the FLSA for every hour of overtime worked in any work week, plus interest, liquidated damages, penalties, and attorneys' fees as provided by law.

## COUNT II
## DECLARATORY JUDGMENT

### 157.

Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs.

### 158.

Under the relevant laws of the United States and the State of Louisiana, Defendants have misclassified Plaintiffs as independent contractors rather than employees; therefore, pursuant to 28 U.S.C. § 2201, this court should issue a declaratory judgment establishing that Plaintiffs were or are employees of Defendants and that Plaintiffs were or are therefore entitled to all of the rights and benefits of employment pursuant to the laws of the United States and the state of Louisiana.

## COUNT III
## VIOLATION OF THE LOUISIANA WAGE PAYMENT ACT
## La. R.S. La. R.S 23:631, *et. sequ*.

### Overtime Violations and Illegal Deductions

### 159.

Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

### 160.

Plaintiffs are also entitled, alternatively, to overtime compensation[3] and, additionally, to reimbursement of illegal deductions, pursuant to La. R.S. 23:631, *et sequ*.

---

[3] *Kidder v. Statewide Transport, Inc., et al*, 129 So.3d 875, 2013-594 (La.App. 3 Cir. 12/18/13) at 880; Employees engaged in *intrastate* commerce may still recover for unpaid overtime under La.R.S. 23:631–32.),881 ([We] apply the law as written and hold that La.R.S. 23:631 requires payment of overtime compensation to employees engaged exclusively in intrastate commerce.)

161.

Under Louisiana law, it is unlawful for an employer to require or permit a non-exempt employee to work in excess of forty (40) hours per week without paying overtime. *Kidder v. Statewide Transp., Inc.,* 2013-594, 129 So.3d 875, 880-81 (La. App. 3 Cir. 12/18/13).   See also, *Leprettre v. RCS, LLC*, 206 So.3d 1215 at 1221 (La.App. 3 Cir. 11/16/16).

162.

Under Louisiana law, it is unlawful for an employer to make deductions from employee wages except "in cases where the employees willfully or negligently damage goods or works, or in cases where employees willfully or negligently damage or break the property of the employer, or in cases where the employee is convicted or has pled guilty to the crime of theft of employer funds." La. Rev. Stat. Ann. 23:635.   See *Glover v. Diving Services International, Inc.*, 577 So.2d 1103, 1107-08 (La.App. 1 Cir. 1991).

163.

Flowers, through its policies and practices described above, willfully violated La. Rev. Stat. Ann. 23:631-635, as follows:

    a.       By failing to pay Plaintiffs overtime pay;

    b.       By failing to make, keep, and preserve accurate time records with respect to the Plaintiffs sufficient to determine their wages and hours; and

    c.       By making deductions from wages in violation of La. R.S. 23:365 for:

        1.       Warehouse rent;

        2.       Handheld computer and other administrative rent or fees;

all of which expenses were for the benefit of the employer, so that reimbursement by employees was against public policy.  See *Newsom v. Global Data Systems, Inc.*, 107 So.3d 781

at 785 (La.App. 3 Cir. 12/12/12).  See also, *Leprettre v. RCS, LLC*, 206 So.3d 1215 at 1221 (La.App. 3 Cir. 11/16/16);

      3.      Charges for shrink; and

      4.      Charges for stales

all of which constitute arbitrary unilateral pecuniary penalties not due from damage to property or negligence, so that recovery from employees is against public policy.  See *Newsom, Leprettre* and *Glover, supra.*

164.

Flowers' actions, described above, constitute willful and continuing violations of La. R.S. 23:631-635, *et. seq.*  Plaintiffs are also entitled to penalties, attorney's fees, and costs as provided by La. R.S. 23:631-635.  See *Leprettre* at 1219-22.

**JURY DEMAND**

165.

Plaintiffs request a trial by jury on all issues.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request of this Court the following relief:

a.      Judgment that Plaintiffs are non-exempt employees entitled to protection under the FLSA;

b.      Judgment against Flowers for violation of the overtime provisions of the FLSA;

c.      Judgment that Flowers' violations of the FLSA were willful;

d.      Judgment that Flowers lacked a good faith or reasonable basis for classifying Plaintiffs as independent contractors;

e. An Order for declaratory and injunctive relief designating the Plaintiffs as employees and enjoining Flowers from pursuing the illegal policies, acts, and practices described in this Complaint;

f. An Order declaring the Flowers' conduct as willful, not in good faith, and not based on reasonable grounds;

g. An Order requiring Flowers to compensate Plaintiffs for the reasonable value of the benefits Plaintiffs provided to Flowers;

h. Reimbursement of unpaid wages at overtime rates for all overtime work as described in this Complaint;

i. Payment of any penalties or other amounts under any applicable laws, statutes, or regulations, including but not limited to, liquidated damages;

j. Judgment in favor of each Plaintiff for damages suffered as a result of the conduct alleged herein, to include pre-judgment interest;

k. Award Plaintiffs reasonable attorneys' fees and costs;

l. Award Plaintiffs punitive damages in an amount to be determined at trial;

m. Grant such other and further legal and equitable relief as this Court deems just and necessary; and

n. Trial by jury on all issues.

Dated:        October 11, 2021                    Respectfully submitted,

/s/ Steven G. Durio
STEVEN G. DURIO (#05230)
D. PATRICK KEATING (#14417)
RANDY GUIDRY (#26909)
LAUREN NOEL MAURER (#37243)
**Durio, McGoffin, Stagg, Shelton
  & Guidry**
220 Heymann Boulevard (70503)
Post Office Box 51308
Lafayette, LA   70505-1308
Phone: (337) 233-0300
Fax:     (337) 233-0694
Email:  durio@dmsfirm.com
            rick@dmsfirm.com
            randy@dmsfirm.com
            lauren@dmsfirm.com

RYAN M. GOUDELOCKE (#30525)
**Caraway LeBlanc, LLC**
130 South Audubon Blvd., Suite 105
Lafayette, LA   70503
Phone:  (337) 345-1985
Fax:     (337) 233-9095
Email:  rgoudelocke@carawayleblanc.com

TRAVIS J. BROUSSARD (#33036)
130 South Audubon Blvd., Suite 109
Post Office Box 82238
Lafayette, LA 70598-2238
Phone: (337) 316-8135
Fax:     (337) 233-9095
Email:  travis.broussard@live.com

**and**

THOMAS M. HAYES, IV (#28600)
**Hayes, Harkey, Smith & Cascio, L.L.P.**
2811 Kilpatrick Blvd. (71201)
Post Office Box 8032
Monroe, LA 71211-8032
Phone: (318) 387-2422
Fax:     (318) 388-5809
Email:  tommy@hhsclaw.com

**ATTORNEYS FOR THE PLAINTIFFS**