**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

**JOSEPH ASH, JUSTIN BOLTON, and**
**MATTHEW CRAWFORD,**

     **Plaintiffs,**

**VERSUS**

**FLOWERS FOODS, INC. and**
**FLOWERS BAKING COMPANY OF**
**BATON ROUGE, LLC,**

    **Defendants.**

**CASE NO.: 1:21-CV-03566**

**DISTRICT JUDGE,**
**DAVID C. JOSEPH**

**MAGISTRATE JUDGE,**
**Joseph H. L. Perez-Montes**

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT FOR THE CLAIMS OF PLAINTIFF MATTHEW CRAWFORD**

---

## TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................... 1

II.     BRIEF SUMMARY OF UNCONTROVERTED FACTS ................................ 2

III.    ARGUMENT ................................................................................................ 5

    A.   Summary Judgment Standard ................................................................. 5

    B.   Crawford Was Exempt Under the MCA Exemption ................................ 5

        1.   Flowers/Baton Rouge is a Motor Private Carrier. ............................ 6

        2.   Crawford Regularly Distributed Goods in the Stream of Interstate Commerce. .. 7

        3.   Crawford Regularly Used a Vehicle Weighing At Least 10,001 and His Use of Personal Vehicle Does Nothing to Entitle Him to Overtime. ........................... 10

    C.   The Outside Sales Exemption Bars Crawford's Overtime Claim ........................... 13

        1.   Crawford's Primary Duty Was Making Sales. .................................. 14

        2.   Crawford Was Customarily and Regularly Away from Flowers' Place of Business. ................ 17

    D.   Summary Judgement Should Be Granted on Crawford's LWPA Claim ................. 17

        1.   Crawford Was Not Subject to Any "Fines." ..................................... 18

        2.   Crawford's LWPA Claim is Time Barred In Either Event. ............... 19

IV.    CONCLUSION ............................................................................................ 21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman v. Coca-Cola Enterprises, Inc.*,
  179 F.3d. 1260 (10th Cir. 1999) ........................................................................15

*Amaya v. NOYPI Movers, L.L.C.*,
  2018 WL 3409150 (5th Cir. July 11, 2018)..........................................................6

*Ansardi v. Louisiana Citizens Property Ins. Corp.*,
  111 So. 3d 460 (La. App. 4. Cir. 3/1/13) ...........................................................19

*Barefoot v. Mid-America Dairymen, Inc.*,
  16 F.3d 1216 (5th Cir. 1994) ...........................................................................8, 9

*Bell v. Assoc. Wholesale Grocers, Inc.*,
  2019 WL 1979935 (E.D. La. 2019) ......................................................................6

*Bell v. Showa Denko K.K.*,
  899 S.W.2d 749 (Tex. App. 1995)......................................................................21

*Benavidez v. Oil Patch Group, Inc.*,
  2022 WL 2903119 (W.D. Tex. Apr. 14, 2022)................................................11, 12

*Bradford v. GG Dist., LLC*,
  2016 WL 951762 (E.D. Tex. Mar. 14, 2016) ........................................................7

*Carley v. Crest Pumping Techs., L.L.C.*,
  890 F.3d 575 (5th Cir. 2018) .......................................................................10, 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)...........................................5

*Chaverri v. Dole Food Co., Inc.*,
  546 Fed Appx. 409, 414 (5th Cir. 2013) (unpublished).........................................21

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)........................................................................................13

*Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*,
  876 F.3d 119 (5th Cir. 2017) .............................................................................5

*Cupps v. Banks*,
  637 So.2d 678 (La.Ct. App. 1994)......................................................................18

*Encino Motorcars, LLC v. Navarro*,
   138 S. Ct. 1134 (2018) ........................................................................................13

*Flood v. Just Energy Marketing Corp.*,
   904 F.3d 219 (2d Cir. 2018) ...............................................................................16

*Ford v. Gannett Co.*,
   2005 WL 3115846 (W.D.N.Y. Nov. 18, 2005) .....................................................9

*Foxworthy v. Hiland Dairy Co.*,
   997 F.2d 670 (10th Cir.1993) ...............................................................................9

*Galbreath v. Gulf Oil Corp.*,
   413 F.2d 941 (5th Cir. 1969) ................................................................................8

*Glanville v. Dupar, Inc.*,
   2009 WL 3255292 (S.D. Tex. Sept. 25, 2009) ...................................................10

*Hampton v. McDermott Int'l*,
   2019 WL 5617025 (W.D. La. 2019) ......................................................................6

*Jewel Tea Co. v. Williams*,
   118 F.2d 202 (10th Cir. 1941) ............................................................................16

*Martine v. Nat'l Tea Co.*,
   841 F. Supp. 1421 (M.D. La. 1993) ...................................................................21

*Martinez v. Superior Healthplan, Inc.*,
   371 F. Supp. 3d 370 (W.D. Tex. 2019) .........................................................16, 17

*McGuiggan v. CPC Int'l, Inc.*,
   84 F. Supp.2d 470 (S.D.N.Y. 2000) .....................................................................9

*Merchants Fast Motor Lines, Inc. v. I. C. C.*,
   528 F.2d 1042 (5th Cir. 1976) ..........................................................................7, 9

*Meza v. Intelligent Mexican Mktg., Inc.*,
   720 F.3d 577 (5th Cir. 2013) ..............................................................................13

*Minor v. Cent. Forest Prod., Inc.*,
   2021 WL 1102437 (N.D. Ala. Mar. 23, 2021) ...................................................12

*Moore v. Fleming Subway Rests., Inc.*,
   680 So.2d 78 (La. Ct. App. 1996) ......................................................................18

*Nielsen v. Devry, Inc.*,
   302 F. Supp. 2d 747 (W.D. Mich. 2003) ...........................................................16

*Norman v. QES Wireline, LLC*,
    2019 WL 4674957, at *7 (S.D. Tex. Aug. 30, 2019), adopted in, 2019 WL
    4673208 (S.D. Tex. Sept. 25, 2019) ..................................................................................11

*Opelika Royal Crown Bottling Co. v. Goldberg*,
    299 F.2d 37 (5th Cir. 1962) ..............................................................................................9

*Quinn v. Louisiana Citizens Property Ins. Corp.*,
    118 So. 3d 1011 (La. 2012) ......................................................................................20, 21

*Reyes v. Goya Foods, Inc.*,
    549 Fed. Appx. 876 (11th Cir. 2013) .............................................................................15

*Rychorcewicz v. Welltec, Inc.*,
    768 Fed. App'x 252 (5th Cir. 2019) .....................................................................10, 11, 12

*Samson v. Apollo Resources, Inc.*,
    242 F.3d 629 (5th Cir. 2001) ..........................................................................................18

*Scales v. Huntleigh USA Corp.*,
    No. 11-2967, 2012 WL 860381 (E.D. La. Mar. 12, 2012) ............................................18

*Shew v Southland Corp.*,
    370 F.2d 376 (5th Cir. 1966) ............................................................................................8

*Siller v. L & F Distribs., Ltd.*,
    109 F.3d 765 (5th Cir. 1997) (per curiam) (unpublished) ................................................7

*Siller v. L&F Distribs.*,
    No. 96-40549, 1997 U.S. App. LEXIS 42893 (5th Cir. Feb. 18, 1997)
    (unpublished) .....................................................................................................................8

*Slaughter v. Board of Supervisors S. Univ.*,
    76 So.3d 438 (La. Ct. App. 2011) ..................................................................................18

*Stole v. Goodnight Corp.*,
    469 So.2d 1072 (La. Ct. App. 1985) ..............................................................................19

*Vallejo v. Garda CL Sw, Inc.*,
    56 F. Supp. 3d 862 (S.D. Tex. Sept. 14, 2014) ..............................................................10

*Vasquez v. Welmer's Contruction, LLC*,
    2021 WL 2193580 (M.D. La. 2021) .................................................................................5

*Vaught v. Showa Denko K.K.*,
    107 F.3d 1137 (5th Cir. 1997) ........................................................................................21

*Walling v. Jacksonville Paper Co.*,
  317 U.S. 564 (1943) ........................................................................................7

*Webb v. Athens Newspapers, Inc.*,
  999 F. Supp. 1464 (M.D. Ga. 1998) ...............................................................9

**Statutes**

29 U.S.C. § 203(k) ..........................................................................................14

29 U.S.C. § 213(a)(1) ......................................................................................13

29 U.S.C. § 213(b)(1) ........................................................................................6

49 U.S.C. § 13102(14) .......................................................................................6

49 U.S.C. § 13102(15) .......................................................................................6

49 U.S.C. § 13501(1)(A) ....................................................................................7

La. C.C. art. 3462 .............................................................................................19

La. C.C. art. 3467 .............................................................................................20

La. C.C. art. 3494 .............................................................................................19

La. C.C. art. 3495 .............................................................................................19

La. C.C.P. art. 421 ...........................................................................................21

La. C.C.P. art. 596 ...........................................................................................20

LSA-R.S. 23:635 ..............................................................................................17

**Other Authorities**

29 C.F.R. § 541.500(a)(1)-(2) .........................................................................13

29 C.F.R. § 541.501(b) ..............................................................................14, 15

29 C.F.R. § 541.504(b) ........................................................................14, 15, 16

29 C.F.R. § 541.504(c) .....................................................................................15

29 C.F.R. §§ 541.504(c)(1)-(4) .................................................................15, 16

29 C.F.R. § 541.700 .........................................................................................13

29 C.F.R. § 541.701 .........................................................................................17

29 C.F.R. § 782.2(a)........................................................................................6

29 C.F.R. § 782.2(b)(2)...................................................................................7

29 C.F.R. § 782.2(b)(3)...................................................................................6

29 C.F.R. § 782.7(b)........................................................................................7

29 C.F.R. § 782.7(b)(1)...................................................................................8

Fed. R. Civ. P. 56(c) .......................................................................................5

Pub. L. No. 110-244, Title III, § 305(c) (2008) ..........................................12

SAFETEA—LU Technical Corrections Act of 2008, Pub. L. 110-244, 122 Stat. 1572..............................................................................................10

Wage and Hour Division Opinion Letter FLSA2018-21 (Aug. 28, 2018) ....................................13

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Flowers Baking Company of Baton Rouge, LLC ("Flowers/Baton Rouge") and Flowers Foods, Inc. ("Flowers Foods") (collectively, "Defendants"), respectfully file this Memorandum in Support of their Motion for Summary Judgment for the claims of Plaintiff Matthew Crawford ("Plaintiff" or "Crawford").

## I.    INTRODUCTION

Crawford is an independent distributor who is seeking overtime under the Fair Labor Standards Act ("FLSA") and relief for alleged unlawful deductions under the Louisiana Wage Payment Act ("LWPA"). The undisputed material facts establish that both claims must fail as a matter of law.

First, even assuming Crawford qualifies as an employee (he does not), the undisputed material facts establish that he was otherwise exempt under the Motor Carrier Act ("MCA") and/or outside sales exemptions. More specifically, Crawford regularly and on a weekly basis delivered products that were produced out-of-state and remained in the stream of "interstate commerce" within the meaning of the MCA until their final delivery to end customers. He also drove a vehicle with a Gross Vehicle Weight Rating ("GVWR") of over 10,001 pounds. This places him squarely within the MCA exemption. While Crawford attempts to save his overtime claims by pointing to the Technical Corrections Act, Crawford failed to provide any evidence in discovery to show that his personal vehicle had a GVWR of under 10,001 pounds or that he used it *each week* in interstate commerce as required. Under recent Fifth Circuit precedent, this is fatal to his overtime claim.

While the MCA exemption serves as an independent basis upon which to grant summary judgment, summary judgment is also warranted under the outside sales exemption. Crawford had a primary duty of making sales because he purchased products from Flowers/Baton Rouge, took

1

title to those products, and thereafter regularly sold them to accounts in his territory passing title

at that time.  Under the plain language of Section 3(k) of the FLSA, which defines a "sale" as the

"transfer of title to tangible property," there can be no question that he was making sales as a matter

of law. Because of this, all other activities he performed in conjunction with those sales, such as

delivering and merchandising products, are also considered exempt outside sales work. In case any

question remains, Crawford's admissions that he was paid based on the amount of product he sold

and that he actively marketed new business and solicited new accounts solidify this conclusion.

Finally, even assuming Crawford could identify some factual issues to avoid summary

judgment on these exemptions (he cannot), his "fine" claim fails under the LWPA because he was

not subject to any "fine" as defined by the LWPA. And, in either event, such claim is time barred.

Based on this, and as discussed more fully below, summary judgment for Defendants is warranted.

## II.      BRIEF SUMMARY OF UNCONTROVERTED FACTS[1]

Crawford entered into a Distributor Agreement with Flowers Baking Co. of Lafayette

("Flowers/Lafayette") on May 21, 2009 whereby he agreed to perform services as an independent

contractor. (SUMF ¶ 1). Pursuant to his Distributor Agreement, Crawford purchased the rights to

sell and distribute certain products within a defined geographic area in Louisiana. (*Id*. ¶ 3). He paid

approximately $75,820 for his distributorship. (*Id.* ¶ 4). As a distributor, Crawford could buy

portions of other territories or sell portions of his territory. (*Id.* ¶ 5). Crawford sold half of his

distributorship in 2014 and admits it was his decision to do so. (*Id*). He sold the remainder of his

---

[1] The Section contains a brief summary of pertinent facts. The comprehensive statement of facts is attached hereto as Defendants' Statement of Undisputed Material Facts In Support of Their Motion for Summary Judgment. This will be cross-referenced by paragraph number and referred to as "SUMF". While some examples of pertinent facts are discussed above, these examples are not exhaustive. Rather, all facts in the SUMF are relevant here and should be incorporated fully herein.

territory and his distributorship shortly thereafter on September 6, 2014. (*Id*). He testified that he received about $175,000 for the sale of his distributorship. (*Id*).

The value of Crawford's territory increased "[t]remendously" after Holsum went out of business sometime in 2012.  (*Id*. ¶ 7). A "bunch" of Holsum accounts called Crawford directly and wanted him to start servicing them.  (*Id*). Crawford admits he did not have to get permission from Flowers to service those new accounts. (*Id*). His sales tripled as a result of securing the Holsum accounts.  (*Id*. ¶ 8). He testified he had to buy an extra truck and two trailers "just to keep up." (*Id*).

Crawford was not required to service his distributorship personally and could choose to hire helpers to service his distributorship. (*Id*. ¶ 9). He hired a total of three helpers to assist him with his distributorship. (*Id*. ¶ 10). He decided what they did, and based that decision on what he knew they could handle. (*Id*). He did not have to get Flowers' approval or permission to hire his helpers: "That was left up to me, who I wanted to work for me." (*Id*). He also decided how much to pay his employees. (*Id*. ¶ 11). As an independent contractor, Crawford also understood he was responsible for all business-related expenses. (*Id*. ¶ 14). The settlement statement he received each week shows a number of business expenses that can be deducted, including stale, territory payments, truck purchase or lease, insurance, administrative fee, warehouse fee, etc. Crawford testified that those were the business expenses for which he was responsible. (*Id*. ¶ 15).

Crawford ordered products for his customers by making changes to the suggested orders "so that [his] customers wouldn't run out of bread." (*Id*. ¶ 12). He made adjustments to the suggested order "[e]very day" because "it wasn't accurate." (*Id*). When asked how he would determine what adjustments to make to his orders for his customers, he responded "[y]ou pay attention to your customers' sales and what you sold every day and every week to them."  (*Id*). He also considered such factors as the time of month, the time of year, and the weather. (*Id*).

3

The products Crawford ordered for his customers were produced by producing bakeries in response to his specific orders. (*Id*. ¶¶ 24-26). Many products Crawford ordered and sold to his customers are only produced by out-of-state bakeries, such as all Tastykake products and various other bread and bun products. (*Id*). After he ordered the products, they were produced by the producing bakeries in response. The product was then shipped from the producing bakery, with the intent that they would be delivered to the end customers for whom the distributors ordered the products shortly thereafter under the Direct Store Delivery ("DSD") system. *Id*. After they are shipped to the warehouse, the products each distributor orders are packed out behind each distributor's truck at the warehouse. (*Id*. ¶ 28). Because the products are perishable with limited shelf lives, products are not inventoried or stocked at the warehouse, except for exceptional circumstances. (*Id*). Further, products are not processed or altered in any way at the warehouse. (*Id*).

Crawford purchased products from Flowers/Baton Rouge at a specified discount percentage off the suggested wholesale price and sold such products to his customers for a higher price. (*Id*. ¶ 34). His compensation was based generally on this profit margin, less business expenses. (*Id*). Crawford testified he was paid "[o]ff of [his] sales" and admits he would "make more money" the more he sold. (*Id*). Crawford admits that under his Distributor Agreement, he was obligated to use his best efforts to maximize his sales. (*Id*. ¶ 37). He believes he did that:  "And I did do that.  Because I made some of my stores worth more than what they were worth." (*Id*). He also testified "I tried to sell as much as I could because I would make more money." (*Id*). He believes he was a good salesman and had the sales skills to make his territory successful. (*Id*). To maximize his sales, he would ask for displays "[i]f he knew the stuff would sell" and would also ask for end caps. (*Id.* ¶¶ 39-40). He also recommended products and asked certain accounts for more space. (*Id.* ¶¶ 41-42).

When operating his distributorship, Crawford typically drove a vehicle with a Gross Vehicle Weight Rating (GVWR) of 10,001 pounds or more. (*Id*. ¶ 30). Crawford used a 2009 Isuzu box truck to service his distributorship every day from 2012-2014. (*Id*. ¶ 29). He testified it was "very seldom" he used his personal vehicle (Ford F-150) for call-backs or other things related to his distributorship. (*Id*. ¶ 32).

## III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  If the plaintiff cannot support each essential element of his claim, summary judgment must be granted on that claim because a complete absence of evidence regarding an essential element necessarily renders other facts immaterial.  Fed. R. Civ. P. 56(c); *Celotex Corp.* 477 U.S. at 322. Although courts view the evidence in the light most favorable to the non-movant, the non-movant must still "come forward with specific facts indicating a genuine issue for trial." *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 876 F.3d 119, 128 (5th Cir. 2017).

### B.    Crawford Was Exempt Under the MCA Exemption

First, summary judgment is appropriate to dismiss Crawford's FLSA claim because the undisputed material facts establish that he was exempt from the FLSA's overtime requirements under the MCA exemption, even if he was an employee, which Defendants deny. [2]

---

[2] While Crawford also plead a claim for overtime under Louisiana law, this claim is preempted and subject to dismissal because he also seeks overtime under federal law. *See Vasquez v. Welmer's Contruction, LLC*,

The FLSA specifically exempts from overtime those employees over whom the U.S. Secretary of Transportation ("Secretary") has power to establish qualifications and maximum hours of service under the federal Motor Carrier Act ("MCA").  29 U.S.C. § 213(b)(1); *Amaya v. NOYPI Movers, L.L.C.,* 2018 WL 3409150, at *2 (5th Cir. July 11, 2018).  An employee meets the requirements of the MCA exemption where: (1) his employer is a motor private carrier or motor carrier; and (2) he engages in activities that affect the safety of operations of motor vehicles with a GVWR or GVW of at least 10,001 pounds in interstate commerce.  29 C.F.R. § 782.2(a); *Amaya*, 2018 WL 3409150 at *2.  It is well-established that as long as a driver regularly or even from time to time transports goods in interstate commerce (i.e., performs safety affecting duties) within the meaning of the MCA, the driver remains exempt from overtime even if he performs other non-safety affecting duties.  29 C.F.R. § 782.2(b)(3) ("[T]he rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek . . .").

### 1.     *Flowers/Baton Rouge is a Motor Private Carrier.*

Under the MCA, the Secretary has authority over drivers who are employed by either a "motor carrier" or "motor private carrier."[3]  Here, Flowers/Baton Rouge, a registered DOT motor carrier, is a motor private carrier because it regularly transports goods across state lines in the

---

2021 WL 2193580 at *5 (M.D. La. 2021) ("Given that Plaintiff is seeking recovery under the FLSA for unpaid wages, Plaintiff's claim for unpaid overtime wages (and associated penalties) under the LWPA are subject to dismissal."); *Hampton v. McDermott Int'l,* 2019 WL 5617025 at *4 (W.D. La. 2019) ("numerous courts have held that when a plaintiff presents claims for overtime under both statutes, the FLSA claim preempts state law for employees engaged in interstate commerce."); *Bell v. Assoc. Wholesale Grocers, Inc.,* 2019 WL 1979935 at *2 (E.D. La. 2019) (same).

[3] A "motor carrier" is defined as "a person providing motor vehicle transportation for compensation."  49 U.S.C. § 13102(14).  A "motor private carrier" is defined as: [A] person, other than a motor carrier, transporting property by motor vehicle when—(A) the transportation is as provided in 13501 . . . [interstate commerce]; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.  49 U.S.C. § 13102(15).

stream of interstate commerce within the meaning of the MCA. (SUMF ¶ 16). Indeed, many of the products Crawford ordered for his customers, which he ultimately sold and distributed to them, were shipped from out-of-state bakeries with the intent that they would be distributed out of state by distributors pursuant to the DSD system. (*Id*. ¶ 25). Flowers/Baton Rouge is the owner or bailee of the property being transported, depending upon the circumstances, and such distribution is conducted to further Flowers/Baton Rogue's business. (*Id.* ¶ 17).  The first element is satisfied.

### 2. *Crawford Regularly Distributed Goods in the Stream of Interstate Commerce.*

Crawford also regularly distributed goods in the stream of interstate commerce within the meaning of the MCA. To satisfy the exemption, drivers must participate in "transportation in interstate or foreign commerce within the meaning" of the MCA.  29 C.F.R. § 782.2(b)(2). The MCA defines interstate commerce as commerce "between a place in . . . a State and a place in another State." 49 U.S.C. § 13501(1)(A). Interstate commerce, for purposes of the MCA, occurs not only when the driver actually transports goods across state lines, but also when there is a "practical continuity of movement from the manufacturers or suppliers without the state, through [a] warehouse and on to customers whose prior orders or contracts are being filled." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 567, 569 (1943). *See also* 29 C.F.R. § 782.7(b) (interstate commerce element is satisfied where the "vehicles do not actually cross state lines but operate solely within a single state if what is being transported is actually moving in interstate commerce").

The Fifth Circuit has defined interstate commerce within the meaning of the MCA to include transportation of goods by a carrier wholly within a state so long as the ultimate destination or origination of the product is outside of that state.  *Siller v. L & F Distribs., Ltd*., 109 F.3d 765, at *1 (5th Cir. 1997) (per curiam) (unpublished) (citing *Merchants Fast Motor Lines, Inc. v. I. C. C.*, 528 F.2d 1042, 1044 (5th Cir. 1976)); *see also Bradford v. GG Dist., LLC*, 2016 WL 951762

(E.D. Tex. Mar. 14, 2016) (granting summary judgment for employer where drivers, who drove solely intrastate, transported goods in the "practical continuity of movement" in interstate commerce, triggering the MCA exemption); s*ee also* 29 C.F.R. § 782.7(b)(1) (the interstate commerce element is satisfied where the "vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce . . .").[4]

As set forth in the Statement of Facts, the uncontroverted evidence establishes Crawford regularly distributes products that are in a practical continuity of movement from out-of-state manufacturers to ultimate delivery to in-state customers in Louisiana. (*See* SUMF ¶¶ 22-29). This is because Crawford orders products for specific customers through the handheld computer, which orders are then placed with the producing bakeries, many of which are located out of state. (*Id*). These bakeries produce the products in response to those specific orders and ship them across state lines with the intent that they will be delivered to the end customers in Louisiana for whom the distributors ordered the products pursuant to the DSD system. (*Id.* ¶¶ 25-29).

Courts—including the Fifth Circuit—have consistently held that the MCA exemption applies when, as here, the individuals drive wholly intrastate routes but deliver products that were produced out of state in response to specific customer orders, projections, or anticipated needs. *See Siller v. L&F Distribs*., No. 96-40549, 1997 U.S. App. LEXIS 42893, at *4-5 (5th Cir. Feb. 18, 1997) (unpublished) (products brewed out of state that were only delivered intrastate that were shipped based on distributors' sales projections remained in stream of interstate commerce for MCA exemption); *Barefoot v. Mid-America Dairymen, Inc.*, 16 F.3d 1216 (5th Cir. 1994) (intrastate transportation of milk was within "practical continuity of movement"); *Shew v*

---

[4] *See also Galbreath v. Gulf Oil Corp*., 413 F.2d 941, 942, 947 (5th Cir. 1969) (MCA exemption applied to drivers who performed solely intrastate transportation of petroleum products that originated out of the state).

*Southland Corp.*, 370 F.2d 376, 380 (5th Cir. 1966) (intrastate transportation of goods ultimately headed out of state was within "practical continuity of movement"); *Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37, 40-41 (5th Cir. 1962) (holding that the intrastate transport of empty bottles destined for a bottling plant outside the state was a part of interstate commerce).[5]

The perishable nature of the goods Crawford delivers, and their limited shelf life, also confirms the goods remain in interstate commerce until reaching the end customer. (SUMF ¶ 26). This non-fungible nature of these goods make it clear the producing bakeries do not intend for the goods to remain in inventory, but rather to continue in interstate commerce and reach the end customers as soon as possible. *See, e.g., Webb v. Athens Newspapers, Inc.*, 999 F. Supp. 1464, 1471-72 (M.D. Ga. 1998) (the "strongest evidence" that the out-of-state newspaper supplements were intended to (and did) remain in interstate commerce until delivery to the end customers was that they were non-fungible in nature and lost their value if not delivered immediately); *see also Ford v. Gannett Co.*, 2005 WL 3115846, at *6 (W.D.N.Y. Nov. 18, 2005) (finding the plaintiffs exempt from the FLSA overtime requirements, relying on the court's reasoning in *Webb*).

Further, the temporary placement of these perishable goods at a warehouse before subsequent delivery of customers does not halt the "practical continuity of movement." *Barefoot*, 16 F.3d 1216, *3 (holding that the halt of shipments of unprocessed milk, without processing or commingling, did not remove the interstate character of the shipments); *Merchants Fast Motor Lines*, 5 F.3d at 917 (holding that local delivery drivers operate in interstate commerce when they

---

[5] *See also Foxworthy v. Hiland Dairy Co.,* 997 F.2d 670 (10th Cir.1993) (plaintiff who ordered products that were produced in Arkansas and shipped to Oklahoma in response for delivery to his customers intrastate was engaged in interstate commerce and exempt under the MCA exemption because the company had a fixed and persisting intent at the time of shipment that they would be delivered out of state); *McGuiggan v. CPC Int'l, Inc.*, 84 F. Supp.2d 470 (S.D.N.Y. 2000) (bakery distributor who sold and distributed products within New York exempt under MCA because products were produced in response to the distributor's specific orders in NJ and then shipped across state lines for ultimate sale and delivery to the end customers for whom the products were ordered).

drive vehicles filled with goods that were shipped to Texas from another state, temporarily stored at a warehouse in Texas, then delivered to a Texas customer through local delivery drivers); *Vallejo v. Garda CL Sw, Inc.*, 56 F. Supp. 3d 862, 870-71 (S.D. Tex. Sept. 14, 2014) ("Goods picked up and delivered intrastate are considered to be in interstate commerce if they originated out of state and the intrastate part of the route is the final phase of an unmistakably interstate transport.").[6]

### 3.     *Crawford Regularly Used a Vehicle Weighing At Least 10,001 and His Use of Personal Vehicle Does Nothing to Entitle Him to Overtime.*

The uncontroverted evidence also establishes that Crawford regularly drove vehicles with a GVWR or GVW of 10,001 pounds or more. (SUMF ¶ 29).

Crawford may argue he is nevertheless entitled to overtime because he used a personal vehicle in connection with his distributorship, rendering him a "covered employee" entitled to overtime under the SAFETEA—LU Technical Corrections Act of 2008, Pub. L. 110-244, 122 Stat. 1572 ("TCA"). Importantly, according to recent Fifth Circuit law, Crawford bears the burden of proof in establishing this exception to the MCA exemption. *Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 580 (5th Cir. 2018) (reversing jury verdict because Plaintiffs never introduced "legally cognizable evidence of GVWR" demonstrating that the vehicle at issue had a GVWR of 10,000 pounds or under); *Rychorcewicz v. Welltec, Inc.*, 768 Fed. App'x 252, 256–57 (5th Cir. 2019) ("It is the [p]laintiffs' burden to show that they fall under the TCA's exception to the MCA exemption."). Crawford also bears the burden of showing that his work on small vehicles in interstate commerce was more than *de minimis* for the TCA exception to apply. *See Rychorcewicz*, 768 F. App'x at 256 (affirming an award of summary judgment to an employer on

---

[6] *See also Glanville v. Dupar, Inc.,* 2009 WL 3255292, at *9–10 (S.D. Tex. Sept. 25, 2009) (holding that the time appliances were at a distribution center within the state did not break the continuity of interstate movement and that the subsequent delivery from the distribution center was the last phase in the interstate shipment).

the MCA exemption in part because plaintiffs only occasionally drove personal vehicles, which the Court found to be "de minimis use"); *see also Norman v. QES Wireline, LLC*, 2019 WL 4674957, at *7 (S.D. Tex. Aug. 30, 2019), adopted in, 2019 WL 4673208 (S.D. Tex. Sept. 25, 2019) (*citing Rychorcewicz*, 768 F. App'x at 256–57) (explaining that to fall under the TCA's exception to the MCA exemption, the plaintiff must show that he "worked on a TCA-eligible vehicle and that [he] did so on a more than de minim[i]s basis").

Since *Carley* and *Rychorcewicz*, district courts within the Fifth Circuit have put an exacting burden on plaintiffs to establish the small vehicle exception applies.  First, courts have required the plaintiffs to prove the small vehicle exception under the TCA applies *each week. See Benavidez v. Oil Patch Group, Inc.*, 2022 WL 2903119 (W.D. Tex. Apr. 14, 2022) ("to trigger the TCA exemption to the MCA exemption, Plaintiff must establish that he used a small vehicle in interstate or foreign commerce on more than a de minimis basis and for each challenged workweek.")  Thus, while a defendant can prove the initial MCA burden on a company-wide basis, Crawford must individually disprove it each and every week. *See Rychorcewicz*, 768 Fed.Appx. at 255 ("our precedent requires courts to evaluate the MCA's applicability on a company-wide basis rather than employee-by-employee").

There is not sufficient evidence in the record for Crawford to establish that the small vehicle exception applies in any week, let alone each week as required to avoid application of the MCA exemption to his claims. For the small vehicle exception to apply at all, a personal vehicle under 10,001 pounds must be used in "interstate commerce." *See Benavidez*, 2022 WL 2903119 at *5.[7] Thus, Crawford must provide sufficient evidence, for each week, that he affected the safety

---

[7] Indeed, the text of the TCA itself makes clear that a "covered employee" for purposes of the TCA means in an individual who: (1) is employed by a motor carrier or motor private carrier; (2) whose work, in whole or in part, is defined (A) as a driver . . . and (B) "as affecting the safety of operation of motor vehicles

or operation of small vehicles in "interstate or foreign commerce." *Id.*; *see also* Department of Labor Field Assistance Bulletin No. 2010–2, issued on November 10, 2010; *Minor v. Cent. Forest Prod., Inc.*, 2021 WL 1102437, at *16 (N.D. Ala. Mar. 23, 2021) ("Because none of the "small vehicles" were used in interstate commerce, the Small Vehicle Exception to the Motor Carrier Act exemption does not apply. Plaintiff is, therefore, subject to the Motor Carrier Act exemption, and is not entitled to claim overtime pay.")

There is no such evidence here. To the contrary, from 2012 until 2014, Crawford used an Isuzu box truck to service his distributorship and, thereafter, he occasionally used his Ford F-150. (SUMF ¶¶ 29-32). In his first deposition, he testified that he delivered bread to his accounts using his personal vehicle "[e]very week." (*Id.* ¶ 31). However, when prompted in his recent deposition, he admitted it was "very seldom" he used his personal vehicle (Ford F-150) for call-backs or other things related to his distributorship. (*Id.* ¶ 32). Moreover, Crawford failed to provide any specific evidentiary proof regarding use of his personal vehicle, nor did he provide any evidence that it had a GVWR of under 10,001 pounds as required. *Benavidez*, 2022 WL 2903119, at *3 (plaintiff's fuel records and declaration "containing no dates, no trip lengths, no purposes for such trips, no destinations, or any other specific details regarding the alleged interstate trips were insufficient to raise a question of fact under the TCA exception"); *Rychorcewicz*, 768 Fed.Appx at 252 (website links stating the GVWR data for particular makes and models of vehicles was not competent because it wasn't tied to vehicles that plaintiffs drove). Without meeting his burden that the small vehicle exception applies each week, and in light of Defendants' evidence that the MCA exemption applies otherwise in all weeks, Crawford's overtime claims fail as a matter of law.

---

weighing 10,000 pounds or less . . . **in interstate or foreign commerce.**" Pub. L. No. 110-244, Title III, § 305(c) (2008) (emphasis added).

### C.     The Outside Sales Exemption Bars Crawford's Overtime Claim

Summary judgment is also warranted because the undisputed material facts establish Crawford was exempt from the FLSA's overtime requirements as an outside salesperson. *See* 29 U.S.C. § 213(a)(1). To qualify for the outside sales exemption, an individual must: (1) have a primary duty of "making sales" within the meaning of Section 3(k) of the FLSA; and (2) be customarily and regularly engaged away from the employer's place of business in performing such primary duty.  29 C.F.R. § 541.500(a)(1)-(2).[8] Courts perform a "functional inquiry" in assessing the outside sales exemption, "that views an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 161 (2012). And, as the Supreme Court has reasoned, FLSA exemptions must be given a "fair interpretation" and construed according to their plain meaning. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018) (rejecting the premise that exemptions must be narrowly construed). *See e.g.* Wage and Hour Division Opinion Letter FLSA2018-21 (Aug. 28, 2018).

Here, using a functional inquiry within the context of sales and delivery of bakery products, and under the plain meaning of the term "sales," the undisputed material facts demonstrate Crawford's primary duty was making sales, and he was customarily and regularly engaged away from Flowers/Baton Rouge's place of business performing sales duties. The Fifth Circuit has previously applied the outside sales exemption to route salesmen in the food and beverage industry. *See e.g. Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577 (5th Cir. 2013). The same result must be reached here.

---

[8] The DOL regulations clarify that an individual's primary duty is the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700.

### 1.    *Crawford's Primary Duty Was Making Sales.*

First, the undisputed material facts establish that Crawford's primary duty was sales. Section 3(k) of the FLSA specifies that "'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). "Sales within the meaning of section 3(k) … include the transfer of title to tangible property" and include any "sale or consignment for sale."  29 C.F.R. § 541.501(b). And, as the regulations governing "drivers who sell" provides,  "in determining the primary duty of drivers who sell, work performed incidental to and in conjunction with the employee's own outside sales . . . , including loading, driving or delivering products, shall be regarded as exempt outside sales work." 29 C.F.R. § 541.504(b). The regulation also includes a list of several non-exhaustive factors when determining whether the driver has a "primary duty" of making sales, including the "presence or absence of customary or contractual arrangements concerning amounts of product to be delivered, . . . method of payment; and proportion of earnings directly attributable to sales." 29 C.F.R. § 541.504(b). All such factors support that Crawford's primary duty was making sales.

The undisputed material facts establish that Crawford's primary duty was sales. He purchased products from Flowers/Baton Rouge at a discounted price, taking title to the products, and then sold the products to his customers at a higher price passing title to them with the sale. (SUMF ¶ 36). Under his Distributor Agreement, Crawford was obligated to use his best efforts to grow his sales.  (*Id*. ¶ 37). When asked about this obligation, he responded "I tried to sell as much as I could because I would make more money." (*Id*). He also actively marketed his business and solicited new accounts in his territory. (*Id*. ¶ 38). To grow his sales, Crawford tried to keep his stores as "full as possible" and testified: "I ordered extra bread, and put it in there on a – on a roller. And I – I gave that store opportunity to get extra sales . . .  Sometimes I – I would sell almost all of

14

it.  Sometimes it was just – it just depends." (*Id*).  He also testified he was a good salesman and that he had the sales skills to make his territory successful. (*Id*. ¶ 37). *See* "29 C.F.R. § 541.501(b). He also admits that his territory and sales increased substantially when he secured the Holsum business. (SUMF ¶¶ 7-8). He also admits he engaged in various other activities to increase his sales. (*Id*. ¶¶ 38-43). There can be no question that he was consummating sales within the meaning of Section 3(k) and his own admissions have made that clear. As such, all other activities he performed that were incidental to and in conjunction with those sales, such as driving, delivering, and the like, are likewise considered exempt outside sales work. 29 C.F.R. § 541.504(b).

Similar cases have concluded the same. In *Reyes v. Goya Foods, Inc.* the Eleventh Circuit found that duties performed by a sales broker such as restocking store shelves, cleaning inventory, and rotating inventory were in conjunction with and in furtherance of his own sales efforts, and thus, were exempt outside sales work. 549 Fed.Appx. 876, 878 (11th Cir. 2013) (per curiam); *see also Ackerman v. Coca-Cola Enterprises, Inc.*, 179 F.3d. 1260, 1265-66 (10th Cir. 1999) (holding that the plaintiffs—who were sales representatives and account managers tasked with selling products to retailers—were exempt outside salespersons, because the plaintiffs took orders and consummated sales with their customers, and thus resembled the driver-salesmen described in the DOL regulations, and all other duties were merely incidental to their primary sales duty). The same result should be found here.[9]

---

[9] The DOL regulations provide four examples of drivers who may qualify as exempt outside sales employees. *See* 29 C.F.R. § 541.504(c). Crawford fits squarely within the enumerated examples under the DOL regulations. See 29 C.F.R. §§ 541.504(c)(1)-(4). Crawford prepared the orders for products for customers based on his analysis specifically focusing on sales, continuously ensured the products he sold his customers were fully-stocked and fresh, and sought placement of special displays for products within in customers' locations. (SUMF at ¶¶ 35-48). Accordingly, he can appropriately be compared to the examples of the drivers set forth in the DOL regulations.

Contrary to Plaintiff's expected contentions, and as Crawford's own testimony confirms, he was not merely delivering products subject to controlling contractual agreements put in place by Flowers/Baton Rouge. The absence of an agreement to deliver a predetermined amount of product is a key determinant of whether an employee is a "driver who sells." *See* 29 C.F.R. § 541.504(b). Here, the undisputed evidence shows that Crawford changed orders for customers "every day" and suggested orders based on the time of month, time of year, and weather conditions. (SUMF ¶ 12). Moreover, Crawford's delivery tasks were incidental to his sales responsibilities because he could—and did—hire helpers to assist with those tasks. (*Id*. ¶¶ 10-12).

And finally, the undisputed evidence shows that Crawford performed his sales duties in the field, on his own, without constant supervision.  He admitted that he did not need permission to hire helpers, that it was "not very often" his sales managers rode with him and it was solely to help him out, and that he was left to his own business judgment for purposes of growing his business. (SUMF ¶¶ 10, 43, and 46).  The level of supervision is critical insofar as "[c]ourts generally focus on whether employees receive little or no direct or constant supervision in carrying out daily work tasks to determine outside sales status." *Martinez*, 371 F. Supp. at 385.[10] In this case, Crawford was not subject to any "supervision" and, even if you credit his assertions that he was, it was significantly lower than that described in *Martinez* and is insufficient to create any genuine issues of material fact here to preclude an award of summary judgment to Defendants.

---

[10] Notably, "nothing in the regulations requires an absence of overall control and supervision for the exemption to apply." *Id*.  In *Martinez*, the district court granted summary judgment to the employer despite evidence that plaintiff had "sales quotas, had to report daily to their immediate supervisors, and were otherwise subject to some control and supervision" as such did not mean they were not exempt under the outside sales exemption. *Id*. at 385; *See also e.g. Jewel Tea Co*., 118 F.2d at 204–08; *Flood v. Just Energy Marketing Corp*., 904 F.3d 219, 234-35 (2d Cir. 2018); *Nielsen v. Devry, Inc*., 302 F. Supp. 2d 747, 758 (W.D. Mich. 2003).

16

### 2.    *Crawford Was Customarily and Regularly Away from Flowers' Place of Business.*

Finally, the undisputed facts establish that Crawford spent the majority of his time away from Defendants' place of business, which clearly satisfies the "customarily and regularly" requirement. 29 C.F.R. § 541.701 ("customarily and regularly" includes work normally and recurrently performed every workweek).  Here, it is undisputed that Crawford performed the majority of his work at customer accounts and performing sales duties in each store. (SUMF ¶¶ 42-44). Courts routinely find employees to be regularly and customarily engaged in business away from their employer's place of business for the outside sales exemption with facts like these. *See e.g. Martinez*, 371 F.Supp.3d at 386 (summary judgment granted in part based on evidence that plaintiffs "regularly and customarily met for face-to-face sales presentations with potential enrollees, primarily at the enrollees' homes").

Because the undisputed material facts establish that Crawford's primary duty was making sales, and he was customarily and regularly away from Defendants' business, his FLSA claim is barred by the outside sales exemption as a matter of law.

### D.    **Summary Judgement Should Be Granted on Crawford's LWPA Claim**

In addition to overtime under the FLSA, Crawford also seeks to recover for certain business expenses, claiming they were unlawful "fines" under the LWPA.  This claim can be easily rejected.

Section 635 provides:

> No person, acting either for himself or as agent or otherwise, shall assess any **fines** against his employees or deduct any sum as **fines** from their wages.  **This Section shall not apply in cases where the employees willfully or negligently damage goods or works**, or in cases where the employees willfully or negligently damage or break the property of the employer . . . **but in such cases the fines shall not exceed the actual damage done.**

LSA-R.S. 23:635 (emphasis added).

### 1.    *Crawford Was Not Subject to Any "Fines."*

Even if the LWPA could potentially apply to an independent contractor and a franchisee like Plaintiff, which it does not, both federal and state courts throughout Louisiana have strictly construed the term "fine" to mean an "arbitrarily fixed and assessed" monetary penalty for violation of a rule or regulation and have *explicitly found* that this term does not automatically encompass every deduction made.  *See Scales v. Huntleigh USA Corp.*, No. 11-2967, 2012 WL 860381, at *4 (E.D. La. Mar. 12, 2012) (Section 635 only "applies to fines, rather than to any deductions an employer might make.  A fine, within the meaning of [the statute] is a pecuniary penalty imposed for violation of some law, rule, or regulation, and denotes a punishment imposed."); *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 637-38 (5th Cir. 2001) (emphasis added) ("As the statute makes clear, not all deductions are prohibited; only fines or deductions made as fines are prohibited.  **The term 'fines' has a very specific and limited meaning.**").  As the Fifth Circuit held in *Samson*, Section 635 must be *strictly construed.*  Even deductions made by an employer for willful violations of the attendance policy were not a "fine" in *Samson* because they were not "arbitrarily fixed and assessed" but instead allowed the employer "to avoid paying an employee for wages to which he was not otherwise entitled."  *Id.* at 638 (citation omitted).

Further, courts have repeatedly found that deductions made pursuant to a written contract between the parties or otherwise consented to in advance—exactly what we have here—are not arbitrary and do not constitute prohibited fines under Section 635. *Slaughter v. Board of Supervisors S. Univ.*, 76 So.3d 438 (La. Ct. App. 2011) (deductions and offsets made pursuant to known policy did not constitute a fine); *Moore v. Fleming Subway Rests., Inc.*, 680 So.2d 78 (La. Ct. App. 1996) (deduction considered a prohibited fine only because employee handbook did not contain specific language authorizing the deduction); *Cupps v. Banks*, 637 So.2d 678 (La.Ct. App. 1994) (deduction was not a fine where employee had accepted employer's policy authorizing deduction

18

as a term of employment). Even deductions that are not contemplated as an ongoing term or condition of putative employment are not arbitrary fines prohibited by Section 635 when authorized by the employee to cover a specific loss. *Stole v. Goodnight Corp.*, 469 So.2d 1072 (La. Ct. App. 1985) (deduction by employer for reimbursement of a loss not a "fine" when the employee has agreed to repay the loss rather than the loss being unilaterally deducted by the employer).

In this case, Crawford cannot point to *any* expense *arbitrarily* assessed against him for *violation of a law, rule, or regulation* as required by the LWPA. Indeed, Crawford admitted that he understood and agreed that he would be responsible for all business expenses and weekly deductions, including, but not limited to, stale, territory payments, truck purchase or leases, insurance, administrative fees, and warehouse fees. (SUMF ¶¶ 14-15). His LWPA claim must be dismissed as a matter of law accordingly.

### 2. Crawford's LWPA Claim is Time Barred In Either Event.

Crawford's LWPA claim is also time barred. Three-year prescription applies to actions for the recovery of compensation for services, including payment of salaries, wages and commissions. La. C.C. art. 3494.  Three-year prescription begins to run from the day the payment becomes eligible and accrues to past due payments, even if there is a continuation of labor or other services. La. C.C. art. 3495.  Prescription may be interrupted or suspended. *Ansardi v. Louisiana Citizens Property Ins. Corp.*, 111 So. 3d 460, 471 (La. App. 4. Cir. 3/1/13). Neither happened here.

Prescription is interrupted when the obligee commences an action against the obligor in a court of competent jurisdiction and venue. La. C.C. art. 3462. However, Crawford did not individually file suit against Defendants until the filing of this individual case on October 11, 2021.

Because Crawford was not a named-plaintiff in the *Richard* lawsuit (but simply a putative class member), that suit was not one filed by Crawford that could interrupt prescription.

And, prescription may only be suspended as established by legislation.  La. C.C. art. 3467. Under La. C.C.P. art. 596, prescription is suspended for claims of the putative class members but only for class actions filed "in the state courts of Louisiana." *Quinn v. Louisiana Citizens Property Ins. Corp.*, 118 So. 3d 1011, 1020 (La. 2012) (emphasis added). Indeed, the plain language of the Louisiana Supreme Court's decision in Quinn confirms that the only way the claims of putative class members are prescribed is if class action complaint is originally filed in Louisiana state court. It is undisputed that the class action complaint here was not filed in state court. Thus, the claims are not prescribed. On that point, the Court stated as follows:

> By tying the operative provisions of La CCP art 596 to unique aspects of Louisiana class action procedure, the legislature has expressed an intent that suspension of prescription under La CCP art 596 can apply only to putative class actions filed in Louisiana state courts. Because Louisiana's procedural laws do not extend to foreign jurisdictions, including the federal courts, any other interpretation of the article would produce the absurd result that prescription could, potentially, be indefinitely suspended – a result clearly at odds with the purpose of prescriptive statutes."

*Quinn*, 118 So.3d at 1019.

Louisiana has rejected cross-jurisdiction tolling for class actions, so that La. C.C.P. art. 596 will not suspend the running of prescription against putative class members' claims that are advanced in a proposed class action filed in federal court. *Id.* at 1022 ("the [Louisiana] legislature rejected 'cross-jurisdictional tolling'… [and] the plaintiff cannot rely upon the recently dismissed class action in [federal court] to establish a suspension of prescription.").  The American Pipe tolling rule for class actions filed in federal court is equally inapplicable to suspend prescription on Crawford's LWPA claim because federal courts will not apply the American Pipe tolling rule

to state law claims, for which the *Erie* doctrine applies, where the state does not recognize cross-jurisdictional tolling. *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1144 (5th Cir. 1997) (*citing Bell v. Showa Denko K.K.*, 899 S.W.2d 749, 757 (Tex. App. 1995) for Texas rule regarding no cross-jurisdictional tolling)). And, Louisiana does not.

Under the foregoing, the *Richard* lawsuit did not cause prescription on Crawford's LWPA claim to be interrupted or suspended. *See, e.g., Chaverri v. Dole Food Co., Inc.*, 546 Fed Appx. 409, 414 (5th Cir. 2013) (unpublished) (reviewing *Quinn* and stating "[a]t least since 1997 … cross-jurisdictional tolling has not existed in Louisiana.")  And here, Crawford did not initiate the instant lawsuit on an individual basis until October 11, 2021. [ECF No. 1]. However, he sold his distributor business on September 6, 2014, (SUMF ¶ 5), more than seven years before he filed the instant lawsuit. His LWPA claim is clearly time-barred and should be dismissed as a matter of law accordingly.[11]

## IV.   CONCLUSION

As the discussion above establishes, summary judgment should be granted to Defendants.

Respectfully submitted, this 3rd day of April, 2023.

/s/ C. Garner Sanford, Jr.
C. Garner Sanford, Jr. (*pro hac vice*)
GA Bar No. 005020
OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
One Ninety One Peachtree Tower,

---

[11] While Crawford may claim that his filing of an opt-in form in Richard somehow suspended the statute, his FLSA consent form says nothing about any LWPA claims – and exclusively mentions the FLSA claims. Richard ECF No. 34-1 ("I understand this lawsuit is brought under the Fair Labor Standards Act of 1938, as amended."). Second, the filing of the opt-in form does not qualify as the "commencement" of an action under Louisiana law so as to interrupt prescription. Louisiana law defines "commencement" of a civil action as "the filing of a pleading presenting the demand to a court of competent jurisdiction."  La. C.C.P. art. 421; *Martine v. Nat'l Tea Co*., 841 F. Supp. 1421, 1422 (M.D. La. 1993) ("In Louisiana, an action is commenced by the filing of a pleading presenting a demand to a court of competent jurisdiction.") (*citing De La Vergne v. De La Vergne*, 479 So.2d 549, 550 (La.App. 1st Cir.1985)).  And finally, as discussed above, prescription could not be suspended in either event because Richard was filed in federal court—not state court.

191 Peachtree St., N.E., Suite 4800
Atlanta, GA 30303
Telephone: 404-870-1714
Email:  garner.sanford@ogletree.com

*/s/ Andrew J. Halverson*
Andrew J. Halverson (La. Bar No. 31184)
OGLETREE, DEAKINS, NASH, SMOAK
   & STEWART, P.C.
325 Settlers Trace Blvd., Suite 201
Lafayette, LA 70508
Telephone:  337.769.6582
Facsimile:  337.989.0441
Email:andrew.halverson@ogletree.com

Counsel for Defendants


## Certificate of Service

I HEREBY CERTIFY that a copy of the above and foregoing document has this date been served to all known counsel of record in this proceeding by:

(     )       Hand Delivery                 (     )       Prepaid U.S. Mail

(     )       Facsimile                       (     )       Federal Express

(     )       E-Mail                           ( X )     CM/ECF System

Atlanta, Georgia, this 3rd day of April, 2023.

*/s/ C. Garner Sanford, Jr.*
C. Garner Sanford, Jr. (*pro hac vice*)

55702522.v2-OGLETREE

22